## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Case No. 05 B 64075 |
| | ) Chapter 13 |
| LEO STOLLER, | ) |
| | ) Honorable Jack B. Schmetterer |
| Debtor. | ) |
| | ) |
| | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON
## MOTION OF PURE FISHING TO CONVERT TO CHAPTER 7

### INTRODUCTION

This case was filed voluntarily under Chapter 13 of the Bankruptcy Code by Leo Stoller

("Debtor" or "Stoller"). A creditor Pure Fishing, Inc. ("Pure Fishing" or "Movant") moved to

convert this case to one under Chapter 7. This became a contested proceeding under Rule 9014

Fed.R.Bank.P. Following evidence hearing before the court, both sides rested and final argument

of counsel was heard on August 31, 2006.

Following argument, decision was announced from the bench that the case would be

converted to one under Chapter 7. It was then stated that written Findings of Fact and

Conclusions of Law would be entered to explain that decision in detail, but there were two

reasons stated on the record each of which warranted conversion. First, the Debtor who was

actively engaged in business for many years lacked business books and records from which his

financial condition and income could be ascertained so as to determine whether his Chapter 13

Plan for payments to the Chapter 13 Trustee was proposed in good faith. Second, Debtor deeded

title in valuable real estate to a family member shortly before filing in bankruptcy and did so

without apparent consideration. The circumstances of that property transfer raised serious

questions as to whether it should or could be attacked as a fraud on creditors or otherwise, an

issue that should be investigated by a Chapter 7 Trustee.

An order converting this case to Chapter 7 was entered September 1, 2006, effective nunc

pro tunc August 31, 2006, when decision was announced. The Court now makes and orders

entry of these Findings of Fact and Conclusions of Law as further and more complete reasons for

the order of conversion.

## NOTICE OF APPEAL

Notice of Appeal for the Order was filed on September 11, 2060. While a trial court

judge cannot enter substantive orders after filing of appeal notice, under circumstances where

Findings and Conclusions are in preparation when Notice of Appeal is filed, the Appeal does not

prevent the filing of Findings and Conclusions so as to aid the reviewing court in understanding

detailed reasons for the ruling. See Reinstine v. Rosenfield, et al., 111 F.2d 892, 894 (7th Cir.

1940); Aoude v. Mobile Oil Corp., 862 F.2d 890, 895 (1st Cir. 1988); Evans v. Lockheed-

Georgia Co., No. C82-657A, 1983 WL 562, at *2 (N.D. Ga. July 27, 1983). Courts have

recognized that entry of Findings and Conclusions to support an order or judgment is permissible

even after Notice of Appeal has been filed because that will expedite rather than interfere with

the appellate process. In re Continental Airlines Corp., 60 B.R. 466, 470 (Bankr. S.D. Tex.

1986) (citing Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939) and Johnson v.

Heyd, 415 F.2d 1005 (5th Cir. 1969)).

## JURISDICTION AND VENUE

On December 20, 2005, Debtor filed a voluntary petition for relief under chapter 13 of the

Bankruptcy Code (the "Petition").

Jurisdiction of this matter lies under 28 U.S.C. §§ 1334(a) and (b) and 157(a).

The Motion to Convert is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

Venue of this case and of the Motion to Convert is proper in this Judicial District

pursuant to 28 U.S.C. §§ 1408 and 1409.

### FINDINGS OF FACT

1.      Pure Fishing is an Iowa corporation with its primary place of business at 1900 18th Street, Spirit Lake, Iowa.  Pure Fishing is a counterclaim plaintiff in the pending case captioned <u>Central Mfg. Co. v. Pure Fishing, Inc.</u>, Case No. 05 C 7255 (N.D. Ill.).

2.      Debtor is an individual, a resident of the state of Illinois, and a counterclaim defendant in the Pure Fishing case along with various of his corporate entities and proprietorships.  On his bankruptcy Schedules he stated as his home address a United States Post Office -- not a postal box number, just the post office.  A Court's notice to Debtor was returned as undeliverable.

3.      When Debtor filed his Chapter 13 Petition, he failed to disclose that he filed for bankruptcy on March 23, 1998, in the Northern District of Illinois, Case No. 98-03288.  Debtor subsequently filed an amendment to disclose that bankruptcy.  (Stip. No. 37.)  Debtor also did not disclose that he filed for chapter 13 relief on March 1, 1985 in the United States Bankruptcy Court for the Northern District of Illinois.  (<u>See</u> PACER Docket, Case No. 85-02729).

4.      Debtor represents that he "has been in the business of litigation since 1968, every day to the current date" (Ex. 7 at pp. 9-10) and that he "is the nation's most renowned Intellectual Property Entrepreneur with over 30 years in the fields of trademarks, licensing and enforcement, expert witness testimony, trademark valuation expert and legal ethics expert." (Ex. 8 at p. 1.)  He advertises services that include trademark valuations, legal research, brief writing, and appeals. (Ex. 8 at p. 2.)[1]

5.      Debtor is not a lawyer.  (Resp. to Req. for Admis. 12; Ex. 77.)

6.      Debtor has represented that the stated monthly income in his Petition is based on "Royalty income received by corporations owned by Debtor and passed through to him." (Resp. to Interrog. No. 10; Ex. 76.)

---

[1]      Pages numbers referenced for an exhibit generally refer to the pagination added at the bottom of each page for an exhibit that did not already bear a page number. Page numbers for deposition transcripts refer to the deposition page by the designation "Ex. XX at Dep. p. YY."

7.      Debtor has admitted that he does not receive W-2 tax and wage statements from regular employment. (Resp. to Req. for Admis. 68; Ex. 77.)

8.      Debtor has admitted that he has not filed a tax return for 2005, nor any quarterly estimated payments for that year, and has no documents related to his 2005 taxes, such as a K-1 statement. (Resp. to Doc. Req. No. 5, Ex. 78.)

9.      For his business described herein, Debtor did not maintain books, ledgers of account, or records of his income and expenses in any coherent form and had nothing from which creditors or the Trustee might readily be able to ascertain his financial condition.

## I.      Debtor Has Failed To Disclose Material Assets And Asset Transfers In His Bankruptcy Schedules

### A.      Debtor Failed to Disclose Asset Transfers of Interest in 1212 N. Lathrop Land Trust

10.      Debtor received an interest in Land Trust No. 03-1-8199 (Midwest Bank and Trust Company) (the "Land Trust") for real property located at 1212 North Lathrop, River Forest, Illinois (PIN 15-01-113-041-0000) (the "Property") upon the death of Bertha Stoller on March 14, 2005. (Resp. to Req. for Admis. 55; Ex. 77; Stip., No. 5.)

11.      In March 2005, the Debtor's beneficial interest in the Land Trust was worth at least about $340,000. (Stip. No. 6.)

12.      On March 15, 2005, Debtor assigned his beneficial interest in the Land Trust to his daughter, Julia Bishop, but retained a right of reversion and direction. (Stip. No. 7; Ex. 3 at p. 2.)

13.      Debtor failed to disclose the Land Trust as a property that he holds or controls. (Ex. 1 at p. 11, Question 14.)

14.      In Debtor's Statement of Financial Affairs, Question No. 10 ("Other Transfers") asked for a list of all other property, other than in the ordinary course of the business or financial affairs of the debtor, that was transferred either absolutely or as security within two years

4

preceding the commencement of this case. Debtor's answer to this question was "none." (Ex. 1 at p. 11.)

15.     The assignment by Debtor of an interest in the Land Trust on March 15, 2005 was for no consideration. (Stip. No. 8; Ex. 77 Resp. to Req. for Admis. 57.)

16.     Debtor executed a document on April 5, 2005, directing the execution of a mortgage for $30,000 on Land Trust No. 03-1-8199 for the land trust at 1212 N. Lathrop, River Forest, IL (PIN 15-01-113-041-0000). (Stip. No. 17; Ex. 77 Resp. to Req. for Admis. 58; Ex. 3 at p. 19.)

17.     Debtor directed the execution of another mortgage for $99,000 for the Land Trust in documents dated within one year before Petition Date. (Stip. No. 18; Ex. 3 at p. 35.)

18.     In both instances, checks for the proceeds of the mortgages were made out to "Leo Stoller," acknowledged as received shortly before filing the Petition, and deposited by Debtor into the Central Manufacturing Company, Inc." checking account where, it became commingled with other funds deposited therein. (Ex. 3 at pp. 35, 324, and 377.)

19.     Receipt of the mortgage proceeds and his payments on the mortgage debt were not disclosed in Debtor's Schedules. (Ex. 1.)

### B.    Debtor did not disclose rental income derived from the house at 1212 North Lathrop, River Forest, Illinois in his bankruptcy Schedules when he had an obligation to do so

20.     Debtor has been leasing to Shelye Pechulis the house at 1212 North Lathrop, River Forest, Illinois (PIN 15-01-113-041-0000) since about June 2005 for $2250 per month. (Stip. No. 21.)

21.     The rent checks issued by Ms. Pechulis were made out to Sentra Industries and deposited in the Sentra Industries, Inc. checking account. (Ex. 5 at pp. 8, 11, 14 and 367.) Following those deposits, checks were drawn on the Sentra Industries, Inc. checking account for deposit into the Central Manufacturing Company, Inc. checking account (Ex. 5 at pp. 8-10, 14-

15, 282 and 291) as well as checks for "cash" and payments to the law firm of Grund & Leavitt for legal fees associated with Debtor's divorce proceedings. (Ex. 5 at 9, 10, 14, and 15.)

22.     Debtor had an obligation to disclose, but did not disclose, the rental income in his bankruptcy Schedules. (Stip. No. 23; See also Ex. 1 at p.7., Question 2 ("Income other than from employment or operation of a business"); and Ex. 1 at p. 27, Schedule G.)

### C.     Debtor receives income from the operation of a number of companies but failed to disclose said income in his bankruptcy Schedules and failed to disclose his interests in said companies

23.     Debtor receives income from the operation of a number of proprietorships, unincorporated associations, and incorporated entities. (Stip. No. 24.)

24.     Debtor had an obligation to disclose, but did not disclose, his interests in the unincorporated associations, proprietorships, and incorporated entities. (Stip. No. 25.)

25.     Checks made out to the unincorporated associations have been deposited to the Central Manufacturing Company, Inc. account. (Stip. No. 26; Ex. 6.)

### D.     Income From Debtor's Proprietorships Were Required To Be Disclosed In The Bankruptcy Schedules

26.     Central Manufacturing Company, Inc. conducts business as "Rentamark." (Ex. 76, Answer to Interrog. No. 1.)

27.     Debtor admits that Rentamark is a proprietorship. (Ex. 77, Answer to Req. for Admis. No. 16.)

28.     "Central Manufacturing Company, Inc." is a name that debtor uses to conduct his personal business. (Stip. No. 13.)

29.     Debtor has admitted that the only records for his business entities are notations on check stubs for his commercial checkbook. (Stip. No. 64.)

30.     Debtor has represented in Response to Interrogatory No. 9 (Ex. 76), that the following entities are assumed names for Central Manufacturing Company, Inc.:

Central Mfg. Inc.
Rentamark
USA Sports Network Association

The American Association of Premium Incentive, Travel Suppliers &
Agents
The National Veterinarian Service Association
The American Recreational Tennis Association
The American Recreational Golf Association
The National Association of Traveling Nurses
The American Sports Association
The U.S. Hardware Industry Association
The National Physician's Association
The National Secretarial Association
The National Optometry Association
The National Accounting Association
Americans for the Enforcement of Intellectual Property Rights
The American Society of Podiatrists & Chiropractors
Medical Associations
The National Association of Dentistry
The National Association of Alternative Medicine

Debtor testified that he used these names as internet sites to attract business inquiry for

his services in obtaining information for a fee. He did not keep records of income from these

sources.

### E.    Central Manufacturing Company, Inc.

31.    Central Manufacturing Company, Inc. is not a corporate entity formed under the

laws of Illinois or Delaware, or registered with the State of Illinois as a foreign corporation under

that name. (Stip. No. 13.)

32.    Instead, Central Manufacturing Company, Inc. is a proprietorship that the Debtor

uses for personal business. (Stip. No. 14.)

33.    Debtor has sole signatory authority for bank accounts in the name of "Central

Manufacturing Company, Inc." (Stip. No. 15.)

34.    First Security Bank savings account No. 104232 opened on Feb 4, 2005 is in the

name of Central Manufacturing Company, Inc. d/b/a Rentamark c/o Leo Stoller. (Ex. 5 at p. 1.)

35.    The alleged FEIN associated with this account was represented by Debtor to be

No. 36-0637000. (Ex. 5 at p. 1.) Debtor has provided no proof that there is a legitimate FEIN

that has been assigned by the U.S. Internal Revenue Service for Central Manufacturing

Company, Inc. as a Delaware or Illinois corporation associated with Debtor.

36.     "Central Manufacturing Company, Inc." maintains checking Account No. 00-60645-0 at First Security Trust & Savings Bank, Elmwood, Park, Illinois. The account is in the name of Central Manufacturing Company, Inc. d/b/a Rentamark c/o Leo Stoller. (Ex. 5 at p. 17.)

37.     Debtor deposited checks made out to a variety of other assumed named proprietorships and corporations into the "Central Manufacturing Company, Inc." checking account, thereby commingling them. (Ex. 6 ¶ 3.a.)

38.     Debtor withdraws substantial sums of cash from the "Central Manufacturing Company, Inc." checking account. (Ex. 5 at p. 49.)

39.     Debtor did not have a personal bank account until weeks before filing the Petition, when he opened an account in his name with Bank of America. (Ex. 79.)

40.     Debtor has not listed any bank account that was in his name for the last three years. (Ex. 76 Resp. to Interrog. 2.)

41.     Funds deposited into in the "Central Manufacturing Company, Inc." checking account were and are Debtor's personal property. (Stip. No. 16.)

42.     During 2004, Debtor withdrew over $37,000 in cash from the account in the name of "Central Manufacturing Company, Inc." (Ex. 6, ¶ 3.e.)

43.     During 2005, Debtor withdrew over $44,800 in cash from the account in the name of "Central Manufacturing Company, Inc." (Ex. 6, ¶ 3.f.)

44.     Debtor causes checks to be drafted from the Central Manufacturing Company, Inc. checking account to First Security Bank and Trust to pay off the mortgage loans secured by the 1212 N. Lathrop property. (Ex. 5 at p. 95.)

45.     Central Manufacturing Company, Inc. is not a signatory on the Notes (Ex. 3 at pp. 32 and 49) and has no property interest in 1212 N. Lathrop or the land trust associated therewith. (Ex. 3 at p. 2).

8

### F.    Sentra Industries, Inc.

46.    Debtor is the CEO, President, and sole shareholder of the corporation Sentra Industries, Inc. ("Sentra"). (Stip. No. 9.)

47.    Sentra maintains checking Account No. 607-187, at First Security Trust and Savings Bank, Elmwood, Park, Illinois (the "Sentra Account"). (Stip. No. 10; Ex. 5 at p. 5.)

48.    Debtor has sole signatory authority for the Sentra Account. (Stip. No. 11; Ex. 5 at p. 5.)

49.    Debtor uses the Sentra Account as a vehicle to transfer funds, such as rent checks for the 1212 N. Lathrop property (Ex. 5 at pp. 14 and 367), to cash (Ex. 5 at p. 15 Check No. 1009), to his divorce attorneys (Ex. 5 at p. 15 Check No. 1008), and into his proprietorship (Ex. 5 at p. 15 Check No. 1011).

50.    Funds are moved between the Sentra Account and an account to Central Manufacturing Company, Inc. without apparent pattern or regular practice. (Ex. 5 at pp. 9, 15.)

51.    During the period of June 18, 2005 through August 31, 2005 Debtor withdrew approximately $2,300 in cash and transferred $4,000 to the account of Central Manufacturing Company, Inc. (Ex. 5 at pp. 9, 10, 15 and 291.)

52.    Quarterly checks from Ms. Shelye Pechulis for rent associated with the 1212 N. Lathrop property are deposited into the Sentra Industries, Inc. checking account, where the funds become commingled with other funds found therein. (Ex. 5 at pp. 11, 16.)

53.    Debtor withdraws substantial sums of cash from the Sentra Industries, Inc. account. (Ex. 5 at pp. 9-10, 15.)

54.    Debtor admitted that he allocated revenue from his trademark operation between the Rentamark entity and S Industries, Inc., based solely on the tax considerations associated with the allocation. (Resp. to Req. for Admis. 17; Ex. 77.)

9

### G.    Central Mfg. Co.

55.    "Central Mfg. Co." ("CMC") is an unregistered company name assumed for the Debtor. Its business operates out of an office located on 7622 West Belmont Avenue, Chicago, Illinois. Central Mfg. Co. is not a corporation that has been organized under the laws of any state. (Stip. No. 39, 41.)

56.    Central Mfg. Co. is a d/b/a name used for Debtor's personal business activities. (Ex. 77 Resp. to Req. for Admis. 2; Ex. 35, 41, 42, 53.)

57.    Illinois also does not recognize Central Mfg. Co. as an assumed business name for any corporation associated with Debtor. (Ex. 43.)

58.    There is no Stoller company or entity that is authorized to do business under the name of "Central Mfg. Co.," only an entity under the different name of "Central Mfg. Co. of Illinois." (Ex. 77 Resp. to Req. for Admis. 5; Ex. 46.)

59.    Debtor has not disclosed income from Central Mfg. Co. in his Schedules. (Ex. 1.)

60.    Debtor has acknowledged that funds in an account under the name of "Central MFG" are his personal assets. This acknowledgment was made in the disclosures provided by the Debtor in connection with his divorce proceeding (Reich v. Stoller, No. 05 D 007216 (Cook County, Ill.)). (Ex. 17 at p. 5.)

61.    Debtor signed responses to interrogatories in Central Mfg. Co. v. HEPA Corporation, Opp. No. 91152243 representing that Central Mfg. Co. had yearly annual sales under the STEALTH brand in 2003 and 2004 of $1,347,691 and $1,587,453, respectively with advertising expenses for those years of $87,701.80 and "$97,348,997" [sic]. (Ex. 77 Resp. to Req. for Admis. 50.)

62.    Debtor deposits checks made out to Central Mfg. Co. into the "Central Manufacturing Company, Inc." checking account, where the funds become commingled with funds from other sources deposited therein. (Ex. 5 at p. 41; Ex. 6.)

10

### H.    Central Mfg. Inc.

63.    Central Mfg. Inc. is registered in Delaware as a corporate entity. Debtor is its president and sole officer. Like his other entities, Central Mfg. Inc. shares the same office address as Central Mfg. Co., Inc. (Stip. No. 40; Ex. 13 at Dep. p. 157.)

64.    Central Mfg. Inc. became registered with Illinois as a foreign corporation in 2005 with only the assumed name of "Central Mfg. Co. of Illinois." (Ex. 77 Resp. to Req. for Admis. 5; Ex. 46.)

65.    Debtor admits that he has not filed a tax return for Central Mfg. Inc. since at least 2003. (Resp. to Doc. Req. 6, Ex. 78.)

66.    Debtor deposits checks made out to Central Mfg. Inc. into the Central Manufacturing Company, Inc. checking account, where the funds become commingled with funds from other sources deposited therein. (Ex. 5 at p. 86.)

### I.    Rentamark

67.    Debtor publishes a weblog at http://rentmark.blogspot.com where he offers his services to others and publishes various articles. (Ex. 77 Resp. to Req. for Admis. 14, 19; Ex. 7.)

68.    On May 30, 2006 Debtor held himself out on his weblog to be "the nation's most renowned Intellectual Property Entrepreneur with over 30 years in the field of trademarks, licensing and enforcement, expert witness testimony, trademark valuation Expert and legal ethics expert." (Ex. 7 at p. 1.)

69.    Also on May 30, 2006 Debtor was representing that "Rentamark is in the business of buying, selling and licensing trademarks, trademark valuations, expert witness testimony, trademark litigation support services, including legal research, drafting pleadings, appeals etc." (Ex. 7 at p. 2.)

70.    Debtor has admitted that he uses the Rentamark (also spelled Rent-A-Mark) entity as a proprietorship for his personal activities. (Ex. 77 Resp. to Req. for Admis. 16; Ex. 26 at Dep. pp. 129 and 160; Ex. 38 at Dep. pp. 30-31; Ex. 40.)

11

71.     Debtor has also testified that he uses the Rentamark name as an assumed name for Central Mfg. Inc.  (Ex. 39 at Dep. pp. 60-61.)

72.     Debtor has also responded in his sworn response to Interrogatory No. 1 (Ex. 76) that Rentamark is an assumed name for Central Manufacturing Company, Inc. (Resp. to Interrog. No. 1; Ex. 76.)

73.     Debtor deposits checks made out to "Rentamark.com" and "Rent-A-Mark" into the Central Manufacturing Company, Inc. checking account where it becomes commingled with other funds.  (Ex. 5 at pp. 39, 42, 119, 156-58; Ex. 6.)

### J.     U.S. Hardware Industry Association

74.     Debtor receives checks from Freightquote.com, Inc. from time to time which are made payable to the order of "U.S. Hardware Industry Assn."  (Ex. 5 at p. 87.)

75.     These checks are deposited into the checking account of "Central Manufacturing Company, Inc." and commingled with funds from other sources found therein.  (Ex. 5 at p. 87.)

76.     Debtor did not produce records from which it can be determined whether he reported in his bankruptcy Schedules the income from U.S. Hardware Industry Assn, which is an unregistered and unincorporated entity.

### K.     National Association of Traveling Nurses

77.     Debtor receives checks from time to time which are made payable to "Natl Assn of Traveling Nurses."  These checks are deposited into the checking account of "Central Manufacturing Company, Inc." and commingled with the funds from other sources found therein. (Ex. 5 at pp. 24, 136, 161; Ex. 6.)

78.     Debtor did not produce records from which it can be determined whether he reported the said income in his Schedules.

### L.    American Sports Association

79.    Debtor receives checks from an entity known as Freightquote.com, Inc. from time to time, which are made payable to "American Sports Assn." These checks are deposited into the checking account of "Central Manufacturing Company, Inc." and commingled with the funds from other sources found therein. (Ex. 5 pp. 87, 161; Ex. 6.)

80.    Debtor did not maintain records from which it can be determined whether he reported this income in his Schedules.

81.    No person other than Debtor is involved in running "American Sports Association." (Ex. 13 at Dep. p. 325.)

### M.    Other Entities

82.    Debtor receives checks from time to time made payable to "Havoc Brand Products and Services." These checks are deposited into the checking account of "Central Manufacturing Company, Inc." and commingled with the funds from other sources found deposited therein. (Ex. 5 at pp. 52, 148; Ex. 6.)

83.    Debtor receives checks made payable to "Stealth Brand Products and Services" and deposits them into the "Central Manufacturing Company, Inc." checking account where the funds become commingled with funds from other sources deposited therein. (Ex. 5 at pp. 43, 148; Ex. 6.)

84.    Debtor deposits checks made payable to "Stealth" and deposits them into the "Central Manufacturing Company, Inc." checking account where the funds become commingled with funds from other sources deposited therein. (Ex. 5 at pp. 93, 137, 145; Ex. 6.)

85.    Debtor deposits checks made payable to "American Society of Podiatrists" and deposits them into the "Central Manufacturing Company, Inc." checking account where the funds become commingled with funds from other sources deposited therein. (Ex. 5 at p. 98; Ex. 6.)

13

86.     Debtor has also sent letters to others representing himself to be the President of "Stealth" (Ex. 27), doing business as the proprietorship "Air Frame" (Ex. 28), and doing business as the proprietorship "Aerospace" (Ex. 30).

87.     Debtor has filed pleadings that identify Sentra Sporting USA Co. as his proprietorship.  (Ex. 37)

88.     Debtor has acknowledged that he founded organizations called "Americans for the Enforcement of Attorney Ethics" and "Americans for the Enforcement of Judicial Ethics."  He uses his website for these organizations to teach others how to file disciplinary complaints against attorneys and judges.  (Ex. 51 at Dep. pp. 98-99.)

89.     Debtor refused to answer when asked if these ethics organizations were really just another name for himself.  (Ex. 51 at Dep. p. 100.)

90.     In 2003, Debtor and his proprietorships "Give a Gift Online," "American Conservation Society," and "Association Network Management" were named in a Consent Decree with the Illinois Attorney General.  (Ex. 54.)

91.     None of these proprietorships has been disclosed in Debtor's Schedules, and there are no records showing Debtor's income therefrom.

**II.     Debtor And His Businesses Are Indistinguishable**

92.     Debtor makes all pertinent decisions for the assumed name entities through which he operates.  (Ex. 13 at pp. 6-7.)

93.     Debtor testified that he is "the actual controlling entity of where the marks go, quality and control, what entity they – what I choose to put them in."  (Ex. 13 at Dep. pp. 23-24.)

94.     All of the business entities owned and operated by Debtor have the same office address.  (Ex. 13 at Dep. p. 157.)

95.     Debtor's corporations do not keep regular corporate books and records of finances.  (Ex. 13 at Dep. pp. 163-64, 172-73, 176; Stip. Nos. 63-65, 67; Ex. 78 Resp. to Req. 11.)

96.    Funds of Debtor's corporations are commingled with funds from other corporations, proprietorships, and with Debtor's personal funds.  (Ex. 6; Stip. Nos. 14 and 16.)

97.    Debtor's corporations have not filed tax returns since at least 2003.  (Ex. 78 Resp. to Req. No. 6.)

98.    Debtor's corporations have not issued W-2 statements.  (Ex. 78 Resp. to Req. No. 10; Ex. 16 at p. 2.)  Debtor has, however, testified that he has three "employees".  (Ex. 13 at pp. 13-14.)

99.    Debtor has also testified (at his 341 Meeting) that he uses three "independent contractors" in his office, but represents that there are no documents that reflect any payment of money, funds, or other valuable asset to these individuals.  (Ex. 78 Resp. to Doc. Req. No. 10.)

100.    Debtor produced no records that his corporations pay, or have paid, dividends. (Ex. 78 Resp. to Req. No. 10.)

101.    Debtor described his corporations as having a negative value.  (Ex. 16 at pp. 2 and 4.)

102.    All stock issued by Debtor's corporations, 1000 shares at issue value of $1.00 each, are owned by Debtor.  (Ex. 1 at p. 17.)

103.    Debtor's corporations have no officers other than Debtor.  (Stip. No. 40; Ex. 1 at p. 17.)

104.    Debtor refers to the assets of his companies and corporations as his personal assets.  (Ex. 13 at Dep. pp. 328-29.)

105.    Debtor directs licensing revenue between his corporations and his proprietorships based on tax considerations.  (Ex. 26 at Dep p. 130-31; Ex. 77 Resp. to Req. for Admis.17.)

106.    Debtor deposits checks made out to "Leo D. Stoller" into the "Central Manufacturing Company, Inc." checking account where the funds become commingled with funds from other sources deposited therein.  (Ex. 5 at p. 99, 161, 174.)

107.    Debtor uses the "Central Manufacturing Company, Inc." checking account as a common account for his personal, proprietorship, and corporate funds where all funds are commingled without associated financial books or records to distinguish funds among the entities. (Ex. 6; Stip. Nos. 63-64.)

108.    None of the checks deposited to the "Central Manufacturing Company, Inc." checking account no. 606-450 are made out to the named account holder. The list of payees for checks deposited to this account include about 20 different persons and entities. (Ex. 6.)

## III.    Debtor's Schedules Are Replete With Omissions and Misleading Disclosures

### A.    Undisclosed Interests in Other Real Estate

109.    In 2005, Debtor has asserted some ownership interests in three residences located in Elmwood Park, Illinois in connection with the divorce proceeding Reich v. Stoller, No. 05 D 007216 (Cook County, Ill.). (Resp. to Req. for Admis. 61; Ex. 77.)

110.    Debtor has not disclosed ownership interests in any of these properties in his Schedules. (Ex. 1)

### B.    Inaccurate Balance in His Personal Bank Account

111.    Debtor's Bank of America accounts were opened shortly before filing of his Bankruptcy Petition. (Ex. 79 at p. 7.)

112.    In response to Interrogatory No. 2, Debtor did not identify any other bank account in his name, whether closed or open. He identified only accounts in the names of Central Manufacturing Company, Inc. and Sentra Industries, Inc. (Ex. 76 Resp. to Interrog. No. 2.)

113.    On the date of the Petition filing, the balance in Debtor's Bank of America account was $3,255.00, rather than $200.00 as represented in Schedule B. (Ex. 1 and 79 at p. 9.)

114.    Debtor's Bank of America account has been used for business purposes, including the payment of certain fees to the State of Delaware for the benefit of Debtor's corporations. (Ex. 79 at p. 18.)

## C.    Inconsistent and Unreliable Representations of Income

115.    Debtor has represented his stated income in the Response to Marital Interrogatories made in connection with the divorce proceeding Reich v. Stoller, No. 05 D 007216 (Cook County, Ill.) to be approximately $4,500 per year for the past three years. (Ex. 77 Resp. to Req. for Admis. 48; Ex. 16 at p. 3.)

116.    Debtor wrote a facsimile transmission dated November 22, 2005 in which he represented that his businesses take in only about $100,000 per year. (Ex. 77 Resp. to Req. for Admis. 51; Ex. 18.)

117.    Debtor has represented to this Court in "Debtor's Response to Motion to Convert to Chapter 7 and for Immediate Appointment of Trustee," on page 7 thereof, that the gross income from Central Mfg. Co. is around $200,000 per year. (Ex. 77 Resp. to Req. for Admis. 52.)

118.    Debtor has admitted that he does not receive W-2 tax and wage statements from regular employment. (Ex. 77 Resp. to Req. for Admis. 68.)

119.    Debtor has represented that he has not filed a tax return for 2005, no quarterly estimated payments, and has no documents related to his 2005 taxes, e.g., a K-1 statement. (Ex. 78 Resp. to Doc. Req. No. 5.)

120.    Debtor's tax return for 2001 showed an adjusted gross income of (-$2,522) on business income of $9,875. (Ex. 14 at pp. 2-7.)

121.    Debtor's tax return for 2002 showed an adjusted gross income of (-$2,844) on business income of $12,675. (Ex. 14 at pp. 8-15.)

122.    Debtor's tax return for 2003 showed an adjusted gross income of (-$3,690) on business income of $12,875. (Ex. 14 at pp. 16-23.)

123.    Debtor's tax return for 2004 showed an adjusted gross income of (-$4,550) on business income of $7,600. (Ex. 14 at pp. 22-29.)

17

124.    Debtor's 2001-2004 tax returns were all filed in November or December of 2005.
(Ex. 14.)

125.    Debtor has not filed tax returns for any company, corporation, association, or
proprietorship for 2003, 2004, or 2005.  (Ex. 78 Resp. to Doc. Req. No. 6.)

126.    The company income and advertising expenses presented in Debtor's income tax
returns for 2001-2003 do not correlate with the income and advertising expenses described by
Debtor in sworn interrogatory responses.  (Compare Ex. 14 with Ex. 15 at pp. 2-3 and Ex. 77
Resp. to Req. for Admis. 50.)

### D.    Undisclosed Trademark Rights and Claims for Trademark Infringement

127.    In response to an Order by Judge Coar in Central Mfg. Co. v. George Brett, Case
No. 04 C 3049 (N.D. Ill.), Debtor was required to identify to the court and certify his interests in
any trademark rights.  On March 22, 2006, Debtor identified ownership rights in the goodwill
represented by two trademark registrations, US Trademark Registration Nos. 2107047
(MERCHANT OF VENICE for restaurant services) and 1765833 (STRADIVARIUS for
stationery and pens).  (Ex. 10-11.)

128.    Debtor did not disclose in his bankruptcy Schedules his ownership of these two
registrations, the business goodwill underlying each, or the business assets associated with each.
(Ex. 1.)

129.    Debtor has previously testified that he "holds rights to the mark STEALTH."  (Ex.
13 at p. 5.)  However, no such rights were identified in Debtor's Schedules.  (Ex. 1.)

130.    Debtor is a named party in more than one current trademark opposition
proceeding or appeal in which he alleges a personal interest in one or more valuable trademark
rights, yet none of these pending proceedings were identified in the Petition or Schedules.  (Ex.
58.)

131.    In a letter dated November 29, 2005, Debtor asserted that he has done business
under the name GOOGLE since 1981, with an aggressive licensing program.  Debtor has levied

18

allegations against Google, Inc. that suggest a potential claim of trademark infringement against this well known search engine company. Debtor has offered to settle the matter for $150,000. (Ex. 23.) His potential claim under the name of that entity was not disclosed in his Schedules. (Ex. 1.)

132.    In a letter dated September 8, 2005, Debtor provided an entity called Loveland Products with a second notice accusing that company of infringement of an undesignated trademark right for STEALTH. Debtor executed the document as "President." The letterhead identifies an entity called STEALTH. (Ex. 27.) Debtor ultimately filed, and still has pending, an opposition against Loveland Products. (Ex. 59.) Debtor did not disclose any of the information contained herein in his Schedules. (Ex. 1.)

133.    Debtor prevailed in a trademark opposition against York International Corporation (Opp. No. 121,420), for use of the mark STEALTH on air conditioners. Debtor asserted, and prevailed, on assertions and submitted proofs of rights in use of that trademark on sales of "fans, air coolers and air conditioners." (Ex. 34, 64.) Debtor has not listed any income nor profits from sales of fans, air coolers, or air conditioners in his Schedules. (Ex. 1.)

134.    Debtor submitted an assignment document as an attachment to a pleading in which he asserted that the assignment of trademark rights from S Industries, Inc. to "Leo Stoller d/b/a Central Mfg" gave him standing to oppose certain registrations. (Ex. 53 at pp. 8-9 and 11-16.) Debtor has not disclosed in his Schedules his ownership interest in the trademarks associated with this assignment, the goodwill of the business associated by such trademarks, or the business profits upon which such goodwill must be based. (Ex. 1.)

IV.    **Debtor Has Failed To Disclose Accurately His Pre-Petition Transfers And Liabilities In His Bankruptcy Schedules**

135.    Debtor failed to list at least four additional creditors -- First Security Trust, IRS Tax Lien, Benjamin, Berneman & Brom, LLC and Querrey & Harrow in his Schedules. The latter three creditors were identified in Debtor's Disclosure Statement in his divorce proceeding as holding approximately $60,000 in claims. (Ex. 17 at p. 4.)

19

136.    Additionally, Benjamin, Berneman & Brom filed a proof of claim in this case

seeking $20,826.  Querrey & Harrow filed a proof of claim seeking $25,382.40.

137.    Debtor has caused checks from the Central Manufacturing Company, Inc.

checking account to be made payable to "Household Credit Services" for account no. 5489 5551

0377 4933 0300 8311.  (Ex. 5 at pp. 59, 168.)  Debtor has not listed this credit account or his

liability associated therewith in his Schedules.  (Ex. 1.)

## V.    Debtor Does Not Have A Regular
Ascertainable Source Of Income to Fund a Plan

138.    Debtor represented that there is a negative value in Stealth Industries, Central

Mfg. Co., and Sentra Industries, Inc.  (Stip. No. 32.)

139.    Debtor has admitted that he does not receive W-2 tax and wage statements from

regular employment.  (Ex. 77 Resp. to Req. for Admis. 68.)

140.    Debtor obtains his income from trafficking in trademarks.  (Stip. No. 42.)

141.    The income of debtor is based on false assertions of trademark infringement

and/or harm due to registration of the challenged party's trademark application.  (Stip. No. 47.)

142.    Debtor admitted that he has been sanctioned previously by the United States

Trademark Trial and Appeals Board for misconduct during administrative opposition

proceedings (Ex. 77 Resp. to Req. for Admis. 35) and is currently under a sanction order by the

Commissioner of the U.S. Patent and Trademark Office that restricts certain activities of Debtor

for two years and permanently restricts other activities.  (Stip. No. 48.)  The sanction Order is

found in Exhibit 72.

143.    Debtor's admitted income is claimed by him to be based on income from the

trademark license fees, trademark license royalties, or settlements on trademark infringement

claims collected by his businesses.  (Resp. to Interrog. No. 8; Ex. 76.)  The rest of his income

from various businesses is undocumented and not ascertainable.

144.    Given Debtor's record in his effort to enforce claims for trademark infringement

to generate most of his income, his expectations of regular future income are doubtful.  In

Central Mfg. Co. v. Pure Fishing, Inc., No. 05 C 725, 2005 WL 3090988, *1 (N.D. Ill. Nov. 16,

2005), Judge Lindberg found that the Debtor was abusing the judicial system by filing spurious

and vexatious litigation. In this respect, he concluded that:

> Mr. Stoller, a non-lawyer, has earned a reputation for initiating spurious and
> vexatious federal litigation. See e.g. Central Mfg. Co. et al. v. Brett, 2005 WL
> 2445898 (N.D. Ill. Sept. 30, 2005) (Coar, J.) ("Stoller appears to be running an
> industry that produces often spurious, vexatious, and harassing federal
> litigation."); S. Indus. Inc. v. Stone Age Equip., Inc., 12 F. Supp.2d 796
> (N.D.Ill.1998) (Castillo, J.) (Stoller initiates "litigation lacking in merit and
> approaching harassment."); S. Indus. Inc. v. Hobbico, Inc., 940 F. Supp. 210, 211
> (N.D. Ill.1996) (Shadur, J.) (Stoller "appears to have entered into a new industry-
> that of instituting federal litigation."). Additionally, Mr. Stoller or his entities have
> been ordered to pay their opponent's attorneys' fees in at least seven reported
> cases. See e.g. Central Mfg. Co. et al. v. Brett, 2005 WL 2445898 (N.D.Ill. Sept.
> 30, 2005) (Coar, J.); S Indus., Inc. v. Ecolab Inc., 1999 WL 162785 (N.D.Ill. Mar.
> 16, 1999) (Gottschall, J.); S. Indus., Inc. v. Stone Age Equip., Inc., 12 F. Supp.2d
> 796, 798-99, 819-20 (N.D. Ill.1998) (Castillo, J.); S Indus., Inc. v. Centra 2000,
> Inc., 1998 WL 157067 (N.D. Ill. Mar.31, 1998) (Lindberg, J.), aff'd by 249 F.3d
> 625, 627-29 (7th Cir.2001); S Indus., Inc. v. Diamond Multimedia Sys., Inc., 991
> F. Supp. 1012 (N.D. Ill.1998) (Andersen, J.); S Indus., Inc. v. Diamond
> Multimedia Sys., Inc., 17 F. Supp.2d 775 (N.D. Ill.1998) (Andersen, J.); S Indus.,
> Inc. v. Diamond Multimedia Sys., Inc., 1998 WL 641347 (N.D.Ill. Sept. 10, 1998)
> (Andersen, J.); S Indus., Inc. v. Kimberly-Clark Corp., 1996 WL 388427 (N.D.Ill.
> July 9, 1996) (Shadur, J.); S Indus., Inc. v. Hobbico, Inc., 940 F. Supp. 210, 212
> (N.D. Ill.1996) (Shadur, J.).

Judge Lindberg concluded "[i]n keeping with Mr. Stoller's reputation, his actions in the

instant litigation have been vexatious and sanctionable." Central Mfg. Co. v. Pure Fishing, Inc.,

No. 05 C 725, 2005 WL 3090988, *1 (N.D. Ill. Nov. 16, 2005).

## VI.    Debtor Does Not Maintain Financial Books Or Records That Would Allow Accurate Evaluation Of Debtor's Assets

145.    Debtor does not keep or maintain financial books or records for his business or

his entities. (Stip. No. 63.) The only records for his business entities are notations on check

stubs for his commercial checkbook. (Stip. No. 64.) These were not produced in response to

discovery. (Ex. 78 Resp. to Doc. Req. No. 2.)

146.    Debtor's business and business entities do not have formal end of year audited

financial reports for calendar years 2003-2005. (Stip. No. 65.)

147.   Debtor has not filed tax returns for any company, corporation, association, or
proprietorship for 2003, 2004 or 2005. (Ex. 78 Resp. to Doc. Req. No. 6.)

148.   In his current Statement of Financial Affairs, Debtor listed Russell Stoller as the
custodian of his records. (Ex. 1.) Debtor has admitted that Russell Stoller died in 2003. (Ex. 77
Resp. to Req. for Admis. 53; Ex. 24; Stip., Nos. 33 to 35.) Debtor has admitted that he knew
Russell Stoller was dead when the Petition was filed. (Ex. 77 Resp. to Req. for Admis. 54.)

149.   Debtor admitted that his businesses do not use a computer-based accounting
system. (Ex. 77 Resp. to Req. for Admis. 25.) Debtor also admitted that his businesses do not
have audited year-end financial statements for 2002-2005 (Ex. 77 Resp. to Req. for Admis. 27)
and that he has no business financial statements of any kind for 2003 to date. (Ex. 78 Resp. to
Doc. Req. No. 11; Stip. Nos. 63 to 67.)

150.   Debtor represents that he has no general ledger or equivalent financial books for
any of his businesses for years 2003 to date. (Resp. to Doc. Req. No. 11; Stip. Nos. 63 to 67.)

151.   Debtor admitted that his businesses do not use an accountant to prepare tax
returns. (Ex. 77 Resp. to Req. for Admis. 28.) Debtor admitted that he uses a manual accounting
system and prepares any tax returns for his businesses himself. (Resp. to Req. for Admis. 26, 29;
Stip. No. 66.)

152.   Debtor admitted that the stated value of his shares of stock in his companies is not
based on an audited report by a CPA or certified auditor. (Ex. 77 Resp. to Req. for Admis. 30.)

153.   Debtor represented that he has no canceled checks, check stubs, bank statements,
ledgers, or correspondence showing disbursements and receipts for the last three years (Ex. 78
Resp. to Doc. Req. No. 2) or documents that reflect the sales or income for any of his businesses.
(Ex. 78 Resp. to Doc. Req. No. 9.)

154.   Debtor previously testified on February 8, 2005, that he tracked income for his
businesses by checkbook stubs and mental recall. (Ex. 13 at Dep. pp. 163-64.) This was

22

basically the same record-keeping system used by him since January 1989. (Ex. 13 at Dep. pp. 172, 176.)

## VII.   Other Findings Not Necessary

155.   In the light of the foregoing Findings, it is unnecessary to deal with the many assertions by Movant that Debtor personally abused other legal proceedings for improper purposes.

156.   Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

## I.   A Petition Filed In Bad Faith Should Be Converted To Chapter 7

Section 1307(c) of the Bankruptcy Code provides that a court may convert a Chapter 13 proceeding to a Chapter 7 proceeding "for cause." 11 U.S.C. § 1307(c).[2]

"Cause" can include filing a petition in bad faith. See, e.g., In re Smith, 848 F.2d 813, 816 n. 3 (7th Cir. 1988); In re Johnson, 228 B.R. 663 (Bankr. N.D. Ill. 1999).

---

[2]   Section 1307(c) provides as follows:

(c) Except as provided in subsection (e) of this section, on request of a party in interest or the United States trustee and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title, or may dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause, including--
(1) unreasonable delay by the debtor that is prejudicial to creditors;
(2) nonpayment of any fees and charges required under chapter 123 of title 28;
(3) failure to file a plan timely under section 1321 of this title;
(4) failure to commence making timely payments under section 1326 of this title;
(5) denial of confirmation of a plan under section 1325 of this title and denial of a request made for additional time for filing another plan or a modification of a plan;
(6) material default by the debtor with respect to a term of a confirmed plan;
(7) revocation of the order of confirmation under section 1330 of this title, and denial of confirmation of a modified plan under section 1329 of this title;
(8) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan other than completion of payments under the plan;
(9) only on request of the United States trustee, failure of the debtor to file, within fifteen days, or such additional time as the court may allow, after the filing of the petition commencing such case, the information required by paragraph (1) of section 521;
(10) only on request of the United States trustee, failure to timely file the information required by paragraph (2) of section 521; or
(11) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

Under Seventh Circuit authority, several factors should be considered when deciding whether a chapter 13 petition was filed in bad faith, including:

    a.  the nondischargeability of the debt;

    b.  the time of the filing of the petition;

    c.  how the debt arose;

    d.  the debtor's motive for filing the petition;

    e.  how the debtor's actions affected creditors;

    f.  the debtor's treatment of creditors both before and after the petition was filed;

    g.  whether the debtor has been forthcoming with the bankruptcy court and the creditors.

In re Sidebottom, 430 F.3d 893, 899 (7th Cir. 2005); In re Love, 957 F.2d 1350, 1359 (7th Cir. 1992) (same).

Furthermore, in evaluating whether a petition was filed in good faith, the inquiry looks at both subjective and objective criteria. In short, "the good faith inquiry is both subjective and objective. That is, both objective evidence of a fundamentally unfair result and subjective evidence that a debtor filed a petition for a fundamentally unfair purpose that was not in line with the spirit of the Bankruptcy Code are relevant to the good faith inquiry." Love, 957 F.2d at 1357.

Finally, a debtor's pre-petition conduct may sometimes be relevant to the bad faith inquiry. Id. at 1359 ("[T]he bankruptcy court did not err in determining that this prepetition activity was relevant to Love's motives at the time he filed the Chapter 13 petition, as is the Debtor's truthfulness and frankness in helping to piece together pertinent financial matters.").

## II.    The Debtor's Bad Faith Is Evident From His Lack Of Candor And His Failure To Maintain Books And Records

The Debtor has not been forthcoming with the Court and creditors by any standard. Indeed, he has not maintained any financial records which would allow the Court, the Chapter 13 Trustee or creditors to understand and assemble his financial status and his ability to pay under a Chapter 13 Plan. Parties have no way of verifying whether the Debtor's income vastly exceeds

24

his liabilities, or whether his ability to pay even the total sum of $14,000 proposed by Debtor under his Chapter 13 Plan is non-existent or inadequate.

Instead, the Debtor admitted that he does not maintain financial records on such matters. He does not have pay stubs, nor does he have financial statements for his businesses. This lack of candor and records by itself justifies a bad faith finding and conversion to Chapter 7. In re Alt, 305 F.3d 413, 421 (6th Cir. 2002) (dismissing case, in part, based upon debtor's failure to provide proper information about financial matters; concluding: Chapter 13 requires the debtor to be honest, forthcoming, truthful, and frank. Whether the debtor has been forthcoming with the bankruptcy court and the creditors is properly considered in deciding whether dismissal for lack of good faith is appropriate. (See Love, 957 F.2d at 1357).

The Debtor's lack of candor also is evident from his Bankruptcy Petition, Schedules and Statement of Financial Affairs. These documents are replete with false statements, misleading information, and omissions of material facts. The Debtor: (i) failed to identify various proprietorships, alter-ego corporations and personal aliases under which he conducts business; (ii) failed to disclose income, including, at a minimum, the rental income received from the Property; (iii) failed to disclose interests in residential properties; (iv) provided inaccurate information such as his place of residence and that his deceased father was at time of his bankruptcy filing the custodian of his corporate records; (v) failed initially to disclose his prior bankruptcy; (vi) failed to identify the transfer of the Property to his daughter within a year of the Petition Date; and (vii) failed to identify certain creditors in his Schedules.

The Debtor's disregard for his obligations under Bankruptcy Chapter 13 provide an independent basis to conclude that this case was filed in bad faith and should be converted. Sidebottom, 430 F.3d at 899; Love, 957 F.2d at 1350; see also In re Henson, 289 B.R. 741, 752 (Bankr. N.D. Cal. 2003) ("However, it is not necessary to find that Debtor filed bankruptcy in bad faith in order to conclude that cause exists to remove this case from Chapter 13, because Debtor has shown that he is not capable of performing as a Chapter 13 Debtor. Debtor has not

25

provided reliable information about his financial condition, he will not make himself available to do so in future ... Cause therefore exists for concluding that this bankruptcy case cannot remain in Chapter 13.").

### III. The Debtor's Bad Faith Is Evident From The Fact That He Would Be Denied A General Discharge In A Chapter 7 Proceeding Due To His Failure To Maintain Records And Perhaps Due To Other Conduct

The Debtor's failure to maintain adequate records regarding his sole proprietorships, his business enterprises and his own personal finances unrelated to the operation of a business also merits a finding of bad faith because of the nexus between that conduct and a Chapter 7 discharge. Simply, the Debtor would be denied a discharge under Chapter 7 due to his failure to maintain adequate records and, under Seventh Circuit precedent, that fact helps establish the Debtor's bad faith in filing for Chapter 13 relief. Id. at 1359 (7th Cir. 1992) ("[T]his court stated in Schaitz that 'the requirement of good faith should not be interpreted to permit 'manipulation of the statute [Chapter 13] by debtors who default on obligations grounded in dishonesty and who subsequently seek refuge in Chapter 13 in order to avoid, at minimal cost, a nondischargeable debt.'").[3]

Here, the undisputed fact that the Debtor failed to maintain adequate books and records from which his financial condition or business transactions might be ascertained provides possible grounds to consider denial of his discharge under Section 727(a)(3).[4]

---

[3]     Although the Love case dealt with a nondischargeable obligation under Section 523, there is no reason its analysis would not apply with equal force, if not greater, to a denial of discharge proceeding under Section 727.

[4]     Section 727(a)(3) provides that "[t]he court shall grant the debtor a discharge, unless

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case

26

Furthermore, the Debtor's transfer of his interest in the house at 1212 North Lathrop within a year of bankruptcy to his daughter for no consideration and failure to disclose that in his bankruptcy filings also provides an independent bad faith basis for considering conversion. Investigation is warranted into that transaction and any grounds that might exist to set it aside. A Chapter 7 Trustee will usually be staffed and equipped for inquiry and litigation into such matters, while the Chapter 13 Standing Trustee is not.

**IV.    This Case Should Be Converted Because
Debtor Failed To Disclose The
Existence Of Unincorporated Businesses He Owns**

"Debtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." In re Yonikus, 974 F.2d 901, 904 (7th Cir. 1992). Debtors also have a duty to maintain adequate records in order to enable creditors and other interested parties to ascertain the debtor's true financial condition.

A Chapter 13 case should be converted to chapter 7 when, like here, the debtor fails to disclose his interests in unincorporated businesses associations or fails to maintain adequate records. In re Buchanan, 225 B.R. 672, 674 (Bankr. D. Minn. 1998) aff'd, Buchanan v. U.S., No. 98-2291, 1999 WL 314819 (D. Minn. Apr 2, 1999) (case converted to chapter 7, in part, because debtor failed to disclose his interests in sole proprietorships and other businesses: "Right from the beginning, on the first page of his petition the debtor failed to disclose trade names he used in the prior six years. Under the required heading "ALL OTHER NAMES used by the debtor in the last 6 years (Include [ ] trade names)", the debtor listed "none" when, in fact, he operated at least six sole proprietorships during that period of time, including Health Personnel, Silver Lining Assisted Lifestyles, Monroe Electronics, United Publishing, Monroe Underwater, and Covenant PCA Services."); In re Henson, 289 B.R. 741, 752 (Bankr. N.D. Cal. 2003) ("However, it is not necessary to find that Debtor filed bankruptcy in bad faith in order to conclude that cause exists to remove this case from Chapter 13, because Debtor has shown that he is not capable of

27

performing as a Chapter 13 Debtor. Debtor has not provided reliable information about his financial condition, he will not make himself available to do so in future, and Lucas has been unable to do so in Debtor's absence. Cause therefore exists for concluding that this bankruptcy case cannot remain in Chapter 13."); In re Fonke, 310 B.R. 809, 817 (Bankr. S.D. Tex. 2004) (Chapter 13 case converted to Chapter 7 case where "Debtor failed to disclose all of his assets on his Schedules, including certain leases, "memberships", farming equipment, livestock, as well as property that he himself judged to be his wife's separate property.").

Nor can the Debtor succeed in arguing that he had no obligation to disclose his interests in various unincorporated businesses ventures. Under Illinois law it is well-settled that an unincorporated business is an asset of the responsible individual and the liabilities of that business also are that same person's liabilities. Corporations are creatures of statute. The corporate entity cannot exist without the authority of law and compliance with the procedures to establish a cognizable corporation that shields personal liability. Stroh v. Blackhawk Holding Corp., 48 Ill. 2d 471, 474 (Ill. 1971) ("A corporation is a creature of statute. It is a legal entity which owes its existence to the fiat of law.").

Thus, use of an assumed name without compliance with the applicable corporate formation laws or assumed name laws creates a sole proprietorship, not a separate legal entity. See Hoskins Chevrolet, Inc. v. Hochberg, 294 Ill. App. 3d 550, 555 (Ill. App. 1998) (finding personal liability by the defendant for improper use of an alleged assumed name, the Court noted that "[t]he Business Corporations Act . . . permits a corporation to elect to adopt an assumed name provided that certain procedures are followed. . . Where those procedures are not followed, the corporation is required to conduct business under its corporate name. . . . The use of an assumed name without complying with the Act or disclosing the corporate name neither creates a legal entity nor does it inform creditors of the existence of the parent corporation."); Vernon v. Schuster, 179 Ill.2d 338, 347-48 (Ill. 1997); Regency Financial Corp. v. Meziere, No. 90 C 428, 1990 WL 103247, at *3 (N.D. Ill. July 16, 1990) ("Where business is conducted under an

assumed name there must be some underlying entity and the Illinois Assumed Business Name

Act requires the entity to file with the State both the identity of the actual entity and its assumed

name.").

**V.      It Has Not Been Established That The Debtor
Does Not Qualify For Relief Under Chapter 13**

Section 109(e) of the Bankruptcy Code provides that "only an individual with regular

income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured

debts of less than $307,675 . . . may be a debtor under chapter 13 of this title." 11 U.S.C.

§ 109(e). Accordingly, in order to qualify for Chapter 13 relief, a debtor must not have debts in

excess of the threshold amount *and* the debtor must have a regular income. If a debtor has debts

that exceed the threshold amount, the case should be converted.

In this case, Pure claims that Debtor's debts exceed the statutory maximum of $307,675.

In determining whether a debtor meets the requirements of section 109(e), the Court may

look beyond the debtor's Schedules to the complaints and judgments in the lawsuits from which

the debts arise.

Simply because a debt is disputed does not exempt it from being included in the Section

109(e) calculation. In re Knight, 55 F.3d 231, 234 (7th Cir. 1995) ("[I]n light of the virtual

synonymy of "debt" and "claim," therefore, we conclude that a disputed claim is a debt to be

included when calculating the § 109(e) requirements"); In re Nicholes, 184 B.R. 82, 87 (B.A.P.

9th Cir. 1995).

Additionally, even a debt that has not been formally liquidated can disqualify a debtor for

Chapter 13 relief. Instead, "[i]f the amount of a claim has been ascertained or can readily be

calculated, it is liquidated-whether contested or not." Knight, 55 F.3d at 235 (emphasis

supplied).

Pure argues that the Debtor is liable for amounts expended by Pure Fishing in litigating

before Judge Lindberg and argues that this liability exceeds $400,000. However, no such claim

was liquidated before Judge Lindberg and no such claim was even filed in this bankruptcy case.

29

Debtor's Schedules admitted to debts totalling $183,000 and unscheduled claims totalling $46,526.71 have been filed. Those debts do not exceed the maximum.

## VI.   Converting This Case Would Best Serve The Interests Of Creditors

Converting this case to a Chapter 7 case also would best serve the interests of creditors.

Creditors are likely to recover more in a Chapter 7 case than they will under the Debtor's proposed Chapter 13 plan which proposes to pay approximately $14,000 to creditors. The Chapter 7 trustee will be able to investigate the Debtor's tangled financial affairs and schedule omissions, and also pursue a possible fraudulent transfer to ensure an equitable distribution to creditors. See In re Eatman, 182 B.R. 386, 394 (Bankr. S.D.N.Y. 1995) (converting case to Chapter 7 served best interests of creditors and estate where schedules were riddled with inaccuracies and omissions, where Chapter 7 trustee can investigate the debtor's financial affairs and bring appropriate actions to recover property, and if necessary object to debtor's discharge where the debtor may have disposed of or concealed assets).

Also, once this case is converted to Chapter 7, the Trustee may, upon investigating Debtor's false statements and lack of records, contend that Debtor should be denied a discharge.

## CONCLUSION

Wherefore, and based both on statements from the bench following final argument and the foregoing detailed Findings of Fact and Conclusions of Law, the Order for Conversion of this case to one under Chapter 7 of the Bankruptcy Code was entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 26 day of September 2006.